In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――

Nos. 18-1687 & 18-1950

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

HEON SEOK LEE,

*Defendant-Appellant/*
*Cross-Appellee.*

―――――――――

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cr-00109-1 — **Sharon Johnson Coleman**, *Judge.*

―――――――――

ARGUED APRIL 9, 2019 — DECIDED AUGUST 21, 2019

―――――――――

Before KANNE, BARRETT, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Crowbar in hand, U.S. Customs Officer Jorge Parra spent December 8, 2010 "cracking open containers" at a warehouse near the Los Angeles seaport. Parra pried open one from South Korea to inspect its freight. Inside he found a fully assembled, five-foot tall industrial fan

called a turbo blower. A placard riveted to the side read, "Assembled in USA."

Presented with a fully assembled machine fresh off the boat from South Korea, which brazenly advertised its assembly in the United States, little sleuthing was required to determine something was amiss. Parra's discovery kicked off a federal investigation that traced back to the defendant in this case, Heon Seok Lee. Prosecutors eventually charged Lee with executing a scheme to defraud local governments by falsely representing that his company manufactured its turbo blowers in the United States.

A grand jury indicted Lee on five counts of wire fraud and three counts of smuggling. After a trial, the jury found Lee guilty on all counts. Lee now appeals his convictions and the restitution ordered, and the government cross-appeals Lee's prison sentence. We find no fault in the trial or the sentence.

## I. Background

### A. The Recovery Act

This criminal case has an atypical origin: an economic stimulus package. Congress passed the American Recovery and Reinvestment Act, Pub. L. No. 111-5, 123 Stat. 115 (2009)—which we will simply call the "Recovery Act"—to jumpstart the flagging domestic economy during the Great Recession. *See* Kameron Hillstrom, *The American Recovery and Reinvestment Act: A Fitting Future for Recovery Legislation*, 44 Pub. Contract L. J. 285, 288 (2015). The Recovery Act earmarked billions to fund public infrastructure projects. *Id*. at 289 (noting the Recovery Act made $261.2 billion available for such projects).

Relevant to this case, Congress allocated $6.4 billion to the EPA for water-infrastructure improvements. The EPA did not spend the money directly; instead it awarded grants to "revolving funds" administered by the States. After receiving EPA grants, the revolving funds then issued low-interest loans to local municipalities or agencies sponsoring specific projects. Those local governments were then responsible for hiring contractors to perform the work.

To achieve Congress's objective of bolstering the American economy, the Recovery Act included the following domestic purchasing requirement, commonly known as the "Buy American" provision:

> None of the funds appropriated or otherwise made available by this Act may be used for a project for the construction, alteration, maintenance, or repair of a public building or public work unless all of the iron, steel, and manufactured goods used in the project are produced in the United States.

Recovery Act § 1605(a), 123 Stat. 303.[1]

At first glance, this requirement seems straightforward. But federal agencies struggled to pin down what it means for a product to have been "produced in the United States." Different agencies used different tests. *See* Thomas D. Blanford, *Navigating the Recovery Act's Buy American Rule in State and Local Government Construction*, 46 PROCUREMENT LAWYER 3, 4 (Fall 2010) (listing five tests used by different agencies). The

---

[1] The Recovery Act's Buy American provision should not be confused with the separate, much older, Buy American Act of 1933, 41 U.S.C. §§ 8301–8305.

EPA adopted the "substantial transformation" standard to administer the Recovery Act, and it developed a three-part test to assess whether a manufacturer substantially transformed a product within the United States.

As a condition to receiving Recovery Act funding, local governments and their contractors were required to abide by the Buy American provision. Federal agencies like the EPA audited projects to ensure compliance. Local governments required their suppliers to complete "Buy American certifications" representing that their products complied with the statute.

### B. KTurbo's Initial Plan

Heon Seok Lee founded KTurbo Inc. in his homeland of South Korea. KTurbo manufactures centrifugal turbo blowers—large industrial fans used to provide oxygen for biological water treatments in wastewater facilities. Turbo blowers are sophisticated and expensive pieces of equipment, requiring on-site programming, testing, and calibration.

Lee saw the Recovery Act as a growth opportunity for KTurbo, whose penetration into the United States market was limited at the time. The Recovery Act earmarked billions for products like KTurbo's turbo blowers. But KTurbo would be unable to tap into those funds unless it demonstrated compliance with the Buy American provision. So, Lee and his sister, Trinity Lee,[2] developed a Recovery Act plan. They researched regulatory guidance from the EPA and monitored larger competitors' responses. KTurbo leadership discussed Buy

---

[2] We refer to the defendant, Heon Seok Lee, as "Lee" and Trinity Lee by her full name. Trinity Lee served as KTurbo's general manager for North America.

American compliance for months, with several in-depth meetings that lasted hours.

KTurbo enlisted independent sales representatives around the country to market its turbo blowers to local governments pursuing Recovery Act projects. KTurbo also consulted with several sales representatives in the early stages of its Buy American planning. One sales representative, Dick Koch, discouraged KTurbo from pursuing a plan to make turbo blowers in South Korea, ship them to the United States, take them apart, and then reassemble stateside. Koch warned Lee and KTurbo in an email that such evasive practices could be deemed criminal:

> The [EPA] webcast specifically excludes Heon Seok's idea of sending the equipment to the US and taking it apart and putting it back together. In fact the webcast says that if you say that is [Buy American] you are committing criminal fraud.

Trinity Lee reassured Koch that KTurbo would use components from both South Korea and the United States and assemble the turbo blowers in greater Chicago. Other sales representatives who inquired about KTurbo's Buy American compliance plan were told the same thing, including by Lee himself.

At that point, KTurbo formed an Illinois subsidiary, KTurbo USA Inc.,[3] leased a warehouse in Batavia, Illinois, and hired three American technicians. KTurbo's sales

---

[3] The legal distinction between KTurbo Inc. and KTurbo USA Inc. does not matter for purposes of this opinion, so we refer to the two companies collectively as "KTurbo."

representatives landed several contracts for Recovery Act projects. In its bids, KTurbo highlighted its domestic presence and promised Buy American compliance. For example, KTurbo submitted a bid to South Burlington, Vermont in the summer of 2009, which included the following Buy American certification:

> By this letter, KTurbo USA certifies that it will manufacture and deliver KTurbo brand blower packages and equipment in compliance with the final requirements of the 2009 U.S. economic stimulus law, The American Recovery and Reinvestment Act of 2009.

KTurbo sent nearly identical compliance letters for projects in California, Massachusetts, Nevada, and Oregon.

These representations—a South Korean company certifying its product was "produced in the United States"—did not go unnoticed. A competitor that lost a bid to KTurbo filed a complaint with the EPA in the fall of 2009. In response, EPA officials visited KTurbo's Batavia facility on October 30, 2009. During that visit, Lee gave a PowerPoint presentation detailing KTurbo's plans to comply with the Buy American provision. He represented that KTurbo would assemble its turbo blowers at the Batavia facility. Slides in Lee's presentation indicated fifty percent of the total input costs would be attributable to American components, assembly, and testing. Trinity Lee sent the EPA a letter confirming these details a few weeks later.

KTurbo manufactured its first turbo blower at the Batavia facility in January 2010. It built nine more there over the next three months, at a rate of one to two weeks per blower.

*C. The Revised Plan*

It did not take long for Lee to abandon that original plan to produce turbo blowers in Batavia. By April 2010, Lee concluded production costs in the United States were prohibitively expensive, and he decided to go back to importing turbo blowers from South Korea. Employees pushed back with concerns about KTurbo's Recovery Act compliance, but Lee forged ahead. At trial, one of KTurbo's technicians explained how the component parts from South Korea began arriving more and more fully assembled, until completely assembled blowers started showing up. No new components were added to the turbo blowers once they reached Batavia. Technicians simply plugged them in and ran performance efficiency tests.

Lee's revised plan depended on its secrecy. He instructed KTurbo employees not to disclose to customers the fact that their turbo blowers were made in South Korea. To evade detection, KTurbo (with Lee's knowledge) went out of its way to avoid shipping the machines from South Korea directly to customers. When municipalities questioned KTurbo about Recovery Act compliance, KTurbo simply lied. Take KTurbo's May 20, 2010 response to Lowell, Massachusetts: "The blower will be assembled and tested at KTurbo's Chicago location." Lee himself participated, emailing a sales representative similar misrepresentations in September 2010: "We assemble and test in Chicago. Only motor and VFD comes from Korea. It is almost Made In USA."

But this scheme unraveled quickly. Jorge Parra's shipyard discovery in December 2010 was the beginning of the end. When U.S. Customs detained KTurbo's products at the border, the company fell behind on its deliveries. This required

more lies to hide that the turbo blowers were coming from overseas and needed to clear U.S. Customs. When a Lowell, Massachusetts general contractor contacted KTurbo about the delays, Joel Schomo (a KTurbo engineer) told him the Batavia facility was waiting for parts to begin final assembly, even though KTurbo had discontinued all assembly operations in Batavia months earlier. At trial, Schomo testified he told this lie because the Recovery Act funded Lowell's project and he did not want to raise any "red flags" that KTurbo "might not be complying with the Recovery Act requirements."

Within two months, federal investigators executed a search warrant at the Batavia facility. Lee was present. During the search, Lee admitted he was aware that the turbo blowers were for Recovery Act projects, that KTurbo shipped them fully assembled from South Korea, and that it was "wrong" to do so.

### D. Lee's Prosecution

About a year later, a grand jury returned an indictment against Lee. It alleged he falsely represented that KTurbo's turbo blowers complied with the Buy American provision when Lee knew KTurbo "did not perform and did not intend to perform substantial transformation of the turbo blowers at the KTURBO facility in Batavia, Illinois, before delivery of the turbo blowers to municipal wastewater treatment facilities receiving Recovery Act stimulus funds." The indictment also charged Lee "knew that turbo blowers were substantially assembled before their arrival in the United States and did not require meaningful assembly or manufacturing in the United States."

By this point, Lee had fled the country. It took three years to extradite him from South Korea. When the government finally brought Lee back to appear, he responded to the indictment with a series of motions to dismiss, each of which the district court denied.

During an eight-day trial, the government presented dozens of witnesses: U.S. Customs officers, federal agents, KTurbo employees, sales representatives, general contractors, and employees of municipal customers. Lee elected to take the stand, and he adamantly denied any knowledge that KTurbo imported fully assembled blowers into the United States. On cross-examination, the government battered Lee's credibility, impeaching him with documentary evidence and other witnesses' testimony. The jury ultimately convicted Lee on all counts.

### E. Post-Trial Proceedings

Lee filed a series of post-trial motions seeking to vacate the jury's verdict; the district court denied each. The district court held three sentencing hearings over several months, which centered on the parties' dispute about how to calculate Lee's guideline range. For wire fraud convictions, the Sentencing Guidelines instruct district courts to begin with a base offense level of seven and then to add levels based on the amount of the "loss" caused by the defendant. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(a)–(b) (U.S. SENTENCING COMM'N Nov. 2018). In this case, the parties disputed whether Lee should receive credit in the loss calculation for the market value of KTurbo blowers sold to customers.

The district court initially ruled that the loss equaled the total amount KTurbo received from defrauded municipalities

(about $180,000), putting Lee's guideline range at 46–57 months. But the court gave Lee a below-guidelines prison sentence of 20 months, plus restitution. Two weeks later, Lee filed a notice of appeal and a motion asking the district court to correct its judgment under FED. R. CRIM. P. 35(a). The district court held a hearing on Lee's Rule 35(a) motion, where it agreed with Lee's argument on the guideline calculation and resentenced Lee to 12 months. After the district court entered its final judgment on March 14, 2018, Lee filed a second notice of appeal on March 28, 2018. Thirty days later, the government cross-appealed Lee's sentence.

## II. Discussion

### A. Wire Fraud Convictions

We begin with Lee's wire fraud convictions. He asks us to vacate them because the government's trial evidence constructively amended the indictment and failed to prove all the elements of the crime.

#### 1. Did the government's case at trial impermissibly deviate from the indictment?

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury … ." U.S. CONST. amend. V. The Founders adopted this grand jury requirement from English tradition, in which lay grand jurors considered whether a crime should be charged while also protecting the accused from prosecutorial overreach. *See Wood v. Georgia*, 370 U.S. 375, 390 (1962); *see also* Andrew D. Leipold, *Grand Jury Requirement*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 431 (David F. Forte & Matthew Spalding eds., 2d ed. 2014). The Supreme Court has explained "that a court cannot permit a defendant to be tried

on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960).

Two related doctrines arise out of this Fifth Amendment requirement: constructive amendment and variance. Both explain differences between the government's case in the indictment and the government's case at trial. Constructive amendment occurs where the trial evidence supports (or the court's jury instructions charge) an offense not alleged in the indictment. *United States v. Burge*, 711 F.3d 803, 813 (7th Cir. 2013). Variance refers to situations where the government's trial evidence "proves facts materially different from those alleged in the indictment." *United States v. Ajayi*, 808 F.3d 1113, 1125 (7th Cir. 2015) (quotation marks omitted). The distinction between the two doctrines is subtle, but significant. Where a different crime has been proved (constructive amendment), it is error per se and the verdict must be vacated. *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007).[4] But where the same crime is proved, only through evidence different than the factual allegations in the indictment (variance), the defendant must demonstrate prejudice to his substantial rights. *Id.*

Lee contends the government constructively amended the indictment by presenting evidence of misrepresentations beyond KTurbo's Buy American certifications. He claims the indictment confined itself to the falsity of the certifications, while the government's trial evidence focused on other lies,

---

[4] This assumes the defendant properly preserved the error in the district court. If the issue was waived or forfeited, we review only for plain error. *United States v. Remsza*, 77 F.3d 1039, 1043–44 (7th Cir. 1996) (assessing defendant's constructive amendment argument under a plain error standard due to defendant's failure to raise it in the district court).

such as false statements in sales presentations, misrepresentations to sales representatives, and misleading emails to general contractors.

Even if we accept as true Lee's interpretation of the indictment and his characterization of the trial evidence, it would not rise to the level of a constructive amendment. The government did not attempt to prove a crime different from the one alleged. *See United States v. Khilchenko*, 324 F.3d 917, 920 (7th Cir. 2003) ("To effect a constructive amendment, the evidence at trial must establish offenses different from or in addition to those charged by the grand jury."). Prosecutors did not argue Lee committed mail fraud when the indictment charged wire fraud. The government's case at trial did not attempt to prove a fraud in the air compressor market after alleging a scheme in the turbo blower market. Constructive amendments arise "where there is a 'complex of facts distinctly different from those set forth in the charging instrument and not where there is a single set of facts.'" *United States v. Galiffa*, 734 F.2d 306, 314 (7th Cir. 1984) (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)). Here, the government consistently maintained that Lee committed wire fraud by selling turbo blowers made in South Korea as if they were made in the United States.

Lee's argument is more aptly characterized as one of variance, although he does not frame it that way. Even if the crime charged remains consistent, it is a problem if the government materially alters the factual underpinnings of that charge. *See United States v. Cina*, 699 F.2d 853, 857–58 (7th Cir. 1983) (defendant may establish reversible error where the variance altered an essential or material element of the charge). But variance claims are subject to harmless error review—we will

not disturb a conviction on account of "a technical deficiency of no prejudice to the defendant." *Id.* (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)). No prejudice exists in this case.

First, despite Lee's characterization, the indictment did tailor its fraud allegations to KTurbo's failure to manufacture its turbo blowers at the Batavia facility. Paragraph 3 of the indictment alleged KTurbo "did not perform and did not intend to perform substantial transformation of the turbo blowers at the KTURBO facility in Batavia, Illinois, before delivery of the turbo blowers to municipal wastewater treatment facilities receiving Recovery Act stimulus funds." It also expressly alleged that Lee knew the turbo blowers were already assembled before arriving in the United States. The government proved those allegations at trial with evidence that Lee knew KTurbo made its turbo blowers in South Korea and lied about that fact. Such evidence matches the indictment's fraud allegations.

Second, even if these misrepresentations were not expressly covered by the indictment's text, they were "part and parcel" of the same scheme described by the indictment. *Nye & Nissen, Corp. v. United States*, 336 U.S. 613, 617 (1949) (no variance where indictment alleged a single scheme to defraud executed in various ways). Additional evidence regarding technical details about how a defendant executed an alleged scheme does not constitute an impermissible variance. *Ajayi*, 808 F.3d at 1125 (presentation of "more detailed" facts at trial not an impermissible variance). Lee cannot demonstrate his Fifth Amendment rights were violated because the government's trial evidence concerned "the same elaborate scheme to defraud … as was described in the indictment."

*Ratliff-White*, 493 F.3d at 821 (quoting *United States v. Dupre*, 462 F.3d 131, 140–41 (2d Cir. 2006)).

Two concerns underlie the constructive amendment and variance doctrines: ensuring criminal defendants have adequate notice of the charges against them and avoiding the risk of double jeopardy. Neither is present here. The indictment notified Lee of the allegations against him: that he committed wire fraud by importing turbo blowers from South Korea while representing they were made in Batavia. *See United States v. Corrigan*, 912 F.3d 422, 428 (7th Cir. 2019) (indictment provided valid notice despite listing wrong name of victim); *United States v. Kuna*, 760 F.2d 813, 819 (7th Cir. 1985) (alleged variance in mail fraud prosecution was harmless because the defendant "was able to identify with great certainty the acts for which he was placed in jeopardy").

The indictment also included specific details about the scheme alleged, alleviating any double jeopardy concerns. *See United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) (holding specificity in the indictment would "avoid any later double jeopardy concerns"). It described the Recovery Act's Buy American provision, how KTurbo leased a warehouse in Batavia, KTurbo's Recovery Act contracts, the fact KTurbo failed "to perform substantial transformation of the turbo blowers at the KTURBO facility in Batavia," Lee's knowledge "that turbo blowers were substantially assembled before their arrival in the United States and did not require meaningful assembly or manufacturing in the United States," and Lee's misrepresentations and concealment of KTurbo's true operations. Such detail in the indictment protected Lee from exposure to double jeopardy. *See United States v. Scheuneman*, 712 F.3d 372, 378 (7th Cir. 2013) (indictment sufficient where it

"presented enough detail to allow [the defendant] to plead double jeopardy to avoid future prosecution based on the same conduct alleged").

Because the indictment afforded Lee ample notice of the case the government presented at trial and included specific details of the crimes alleged to avoid double jeopardy risk, no impermissible constructive amendment or variance occurred in this case.[5]

### 2. *Did the government present enough evidence to convict Lee of wire fraud?*

Lee appeals the district court's denial of his motion for acquittal under FED. R. CRIM. P. 29. We review such decisions de novo, asking if the evidence—viewed in the light most favorable to the prosecution—could support a rational finding of all the essential elements of the crime beyond a reasonable doubt. *United States v. Mohamed*, 759 F.3d 798, 803 (7th Cir. 2014). Put differently, we reverse only if the trial record "is devoid of evidence from which a jury could conclude guilt beyond a reasonable doubt." *United States v. Alhalabi*, 443 F.3d 605, 613 (7th Cir. 2006). Given this deference to the jury verdict, Lee's hurdle on appeal is high, as "we rarely reverse a conviction for mail or wire fraud due to insufficient evidence." *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016).

---

[5] Lee's concerns are also mitigated because the district court gave the jury a copy of the indictment and instructed jurors to convict only if the government had proved the crimes it alleged. *See United States v. Cusimano*, 148 F.3d 824, 830–31 (7th Cir. 1998) (district court's provision of the indictment to the jury and proper instruction on it "establish[ed] that there was no constructive amendment to the indictment").

To convict a defendant of wire fraud, the government must prove three elements: (1) a scheme to defraud, (2) the defendant's intent to defraud, and (3) the defendant's use of interstate wires in furtherance of the scheme. *United States v. Jackson*, 860 F.3d 438, 446 (7th Cir. 2017). Lee challenges the government's proof on the first element, the scheme to defraud. The wire fraud statute, 18 U.S.C. § 1343, reaches "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987).

On appeal, Lee argues that KTurbo's Buy American certifications were not false. He claims KTurbo's turbo blowers complied with the Buy American provision because they were made in South Korea. That claim is not as self-contradictory as it first sounds, given the text of Recovery Act § 1605(d), which requires the statute to be "applied in a manner consistent with United States obligations under international agreements." Both the United States and South Korea have joined the World Trade Organization's Agreement on Government Procurement (WTO-GPA), which requires all signatories to provide all other signatories' exports "treatment no less favourable than the treatment the Party, including its procuring entities, accords to: (a) domestic goods, services and suppliers; and (b) goods, services and suppliers of any other Party." WTO-GPA art. 4 § 1, Apr. 6, 2014, 3008 U.N.T.S. Reg.

No. A-31874.[6] In other words, the WTO-GPA is a multi-lateral "most favored nation" clause for government purchasing. Lee interprets Recovery Act § 1605(d) to mean the WTO-GPA's most favored nation clause supersedes the Buy American provision, such that South Korean products must be given the same treatment as American products for purposes of the Recovery Act.[7]

Critically however, when the Recovery Act was enacted the EPA publicly rejected the interpretation Lee now offers. An April 2009 EPA memorandum explained that the agency interpreted Recovery Act § 1605(d) to apply to direct purchases by the federal government and the specific state and local agencies expressly listed in the WTO-GPA's appendices, but not "to procurement initiated by local entities ([state revolving fund] assistance recipients), unless they are listed in the appendix." U.S. ENVTL. PROT. AGENCY, Memorandum on

[6] By its terms, the WTO-GPA covers purchases made by the EPA above certain dollar thresholds. WTO-GPA, Coverage Schedules, *United States* ann. 1. Coverage of purchases made by States themselves, state agencies, and local municipalities is more complicated, varying from State to State and from agency to agency within a State. WTO-GPA, Coverage Schedules, *United States* ann. 2–3; *see also* Hong-Sik Chung, *Government Procurement in the United States–Korea Free Trade Agreement: Great Opportunities for Both Sides?*, 34 NW. J. INT'L L. & BUS. 299, 303 (2014). But the WTO-GPA provides that where a covered entity "requires persons not covered under a Party's annexes to Appendix I to procure in accordance with particular requirements, Article IV shall apply *mutatis mutandis* to such requirements." WTO-GPA art. 2 § 5.

[7] Federal purchasing regulations provide that where an international agreement applies, the "restrictions of section 1605 of the Recovery Act do not apply to designated country iron, steel, and/or other manufactured goods." 2 C.F.R. § 176.160(b)(ii). South Korea is listed as a "designated country" based on its membership in the WTO-GPA. 2 C.F.R. § 176.160(a).

Implementation of Buy American provisions of P.L. 111-5 (Apr. 28, 2009), https://www.epa.gov/sites/production/files/2014-12/documents/buy_am.pdf (last visited August 13, 2019). In the nature of a "smoking gun," federal agents found a copy of this EPA memorandum in KTurbo's Batavia facility, with the relevant paragraph flagged by handwritten markings. Reasonable jurors could thus conclude Lee was aware that the EPA did not consider South Korean products Buy American compliant.

As a result, even if one accepts Lee's interpretation of Recovery Act § 1605(d), the EPA's express rejection of it makes KTurbo's South Korean manufacturing a "material" fact for wire fraud purposes. *Neder v. United States*, 527 U.S. 1, 16 (1999) (holding a statement is "material" if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed") (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). KTurbo could not legitimately certify its Buy American compliance, at least not without disclosing to customers that the turbo blowers were made in South Korea. Federal fraud statutes reach such misleading omissions of material information. *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005).

A reasonable purchaser in this scenario—one who received funds from the EPA pursuant to the Recovery Act and was bound to comply with the Buy American provision— would deem it highly relevant whether a supplier based its Buy American certification on an interpretation of the statute expressly rejected by the EPA. A series of trial witnesses consistently testified that Recovery Act compliance was "absolutely vital," given it was a legal requirement of the project funding. Without Buy American compliance, municipalities

jeopardized losing all Recovery Act funding from the EPA. As one customer testified, his municipality considered KTurbo's representations that the turbo blowers were "Assembled in USA" to be "extremely important" because "it bolstered [their] belief that [the turbo blower] was substantially transformed in the United States." Municipal employees also testified they would not have purchased KTurbo's blowers without KTurbo's Recovery Act assurances.

Where the fraud alleged deals with a half truth or material omission, we generally require proof of an act of concealment on the part of the defendant. *See Stephens*, 421 F.3d at 507. The record in this case unmistakably reflects such concealment. Trial evidence showed KTurbo's repeated misrepresentations to its customers about where KTurbo made its turbo blowers. For example, KTurbo sent the City of Pendleton, Oregon a Buy American certification in April 2010—shortly after Lee decided to stop all domestic manufacturing operations—representing that KTurbo had "established an assembly facility in Batavia, Illinois, where partial manufacturing and assembly of all units sold in North America will be complete[d]." No one at KTurbo ever corrected that misrepresentation. At the beginning of 2011, KTurbo sent the City of Ottawa, Illinois a similar Buy American certification, signed by Trinity Lee, which stated: "All assembly of the completed unit will be executed domestically. The assembly process includes wiring and panel assembly, riveted frame assembly, total assembly including all internal connections and power wiring, tubing and final calibration will be perofrmaned [sic] at KTurbo USA in Batavia, IL." None of that certification was truthful, but it was emblematic of KTurbo's fraudulent scheme. *United States v. Betts-Gaston*, 860 F.3d 525, 533 (7th Cir. 2017) (jurors are permitted to infer fraudulent methodologies from evidence of

similar fraudulent transactions). KTurbo repeatedly assured municipalities and their general contractors of its Recovery Act compliance. Several customers testified at trial about their belief that KTurbo made its turbo blowers in the United States.

KTurbo also misled its own sales representatives into thinking KTurbo manufactured turbo blowers in Batavia, not South Korea. These sales representatives testified they told customers—based on KTurbo's representations to them—that KTurbo complied with the Buy American provision because it manufactured and assembled its blowers in Batavia. Lee masterminded these material misrepresentations, even if he used sales representatives to pass them on to the ultimate customers. *See United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013) ("Nothing in the statutory text of 18 U.S.C. § 1341 requires a scheme to defraud to involve deception of the same person or entity whose money or property is the intended object of the scheme."). He is responsible for misrepresentations he commanded or willfully caused others to make as KTurbo's chief executive. 18 U.S.C. § 2; *see also United States v. Gunning*, 984 F.2d 1476, 1483 (7th Cir. 1993) ("One who counsels or commands another to commit a crime, and knowingly and actively contributes toward its success, is guilty of that crime under 18 U.S.C. § 2.").

But Lee himself also actively participated in the cover up. During his trial cross-examination, Lee acknowledged he knew that KTurbo's customers and the EPA cared about Buy American compliance. But he admitted he told customers that KTurbo blowers were manufactured and assembled in the United States. When a sales representative asked Lee about Buy American compliance in a September 2010 email, Lee

responded: "We assemble and test in Chicago. Only motor and VFD comes from Korea. It is almost Made In USA." Lee made that statement months after KTurbo stopped assembly in the United States. Even as the scheme began to unravel in early 2011, Lee persisted in his lies. On January 28, 2011, a sales representative directly asked Lee about a rumor that federal agents were investigating KTurbo. Lee responded by ensuring him that KTurbo faced no Recovery Act issues: "Most important parts is [sic] final assembly and testing. We are doing those, so we are compliant." Then, on February 8, 2011, when representatives of Pendleton, Oregon, asked KTurbo where its turbo blowers would be assembled, Lee wrote: "In Chicago the blowers will be finalized and tested and shipped."

Lee also challenges the government's proof of his intent to defraud. A defendant acts with an intent to defraud where he acts "willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another." *United States v. Pust*, 798 F.3d 597, 600 (7th Cir. 2015) (quoting *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000)). Lee claims the government failed to prove he intended to defraud anyone because the trial evidence showed KTurbo took concrete steps toward manufacturing turbo blowers in the United States.

Lee's intent argument ignores that his misrepresentations continued well beyond April 2010, when he decided to stop KTurbo's American manufacturing operations. That Lee kept telling people KTurbo assembled its turbo blowers in Batavia months after KTurbo ceased doing so is strong circumstantial evidence of Lee's intent to defraud. *Pust*, 798 F.3d at 600–01 (specific intent to defraud may be established by

circumstantial evidence and examination of the scheme it-
self). Agents' discovery of copies of the EPA's guidance mem-
oranda on the Buy American provision, as well as testimony
from other KTurbo employees about the extent of KTurbo's
Recovery Act meetings and planning, support the conclusion
that Lee willfully attempted to circumvent the law.

A jury also could reasonably conclude that Lee never in-
tended to make turbo blowers in Batavia long term, but rather
set up the facility as part of his scheme to mislead the EPA,
sales representatives, and customers. *Cf. United States v. Freed*,
921 F.3d 716, 724 (7th Cir. 2019) (holding a promise made
without a present intention to keep it can be fraudulent). After
all, Lee did not wait even a full three months before putting
the kibosh on the entire operation. Viewing the evidence in
the light most favorable to the prosecution, there is more than
enough to conclude Lee intended to deceive and defraud
KTurbo's customers.

The trial evidence presented over the course of eight days
adequately supports Lee's participation in a scheme to de-
fraud and his intent to do so. Lee does not challenge his use
of interstate wires as a part of that scheme. With all three ele-
ments of wire fraud adequately established in the trial record,
we affirm the jury's verdict.

### B. Smuggling Convictions

We turn now from Lee's wire fraud convictions to his three
smuggling convictions under 18 U.S.C. § 545. The statute pro-
vides, in part:

> Whoever fraudulently or knowingly imports or
> brings into the United States, any merchandise

> contrary to law … Shall be fined under this title or imprisoned not more than 20 years, or both.

Over a century ago, when dealing with the predecessor to § 545, the Supreme Court held the words "contrary to law" refer to legal provisions outside the statute itself. *Keck v. United States*, 172 U.S. 434, 437 (1899). A violation of § 545 requires a violation of another law—the predicate offense if you will—done with a fraudulent or knowing mindset. In this case, the government claimed Lee violated 19 U.S.C. § 1304(a):

> [E]very article of foreign origin … imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.

Lee asserts that a violation of § 1304(a) cannot serve as a predicate offense for a § 545 conviction. According to Lee, the words "imports … merchandise contrary to law" in § 545 mean that the merchandise itself is per se illegal to import, not merely that the merchandise was imported in a condition noncompliant with some federal law or regulation somewhere.

In making this argument, Lee stresses the title of § 545: "Smuggling goods into the United States." He contends the word "smuggling" refers exclusively to bringing on shore goods whose importation is categorically prohibited. Lee effectively says he could not have "smuggled" the turbo blowers into the United States because turbo blowers are allowed in the United States.

Even accepting Lee's narrow interpretation of the word "smuggling,"[8] the text of the statute is not so cabined when examined in its entirety. Section 545 contains two separate prohibitions; we must consider both when assessing the statute's meaning. *See United States v. Fisher*, 6 U.S. 358, 386 (1805) (Marshall, C.J.) ("It is undoubtedly a well established principle in the exposition of statutes, that every part is to be considered, and the intent of the legislature to be extracted from the whole."). Section 545's first paragraph, which is not at issue, criminalizes "knowingly and willfully … smuggl[ing], or clandestinely introduc[ing] … into the United States any merchandise which should have been invoiced … ." That language criminalizes smuggling goods into the United States, and the statute's title summarizes that prohibition. But § 545's second paragraph—the one that is at issue—is broader. It criminalizes "fraudulently or knowingly import[ing] … any merchandise contrary to law … ." The text of the second paragraph of § 545 makes no mention of the word "smuggling."

A statute's title or heading is a permissible indicator of the meaning of its text. *Yates v. United States*, 135 S. Ct. 1074, 1083 (2015); *see also* ANTONIN SCALIA AND BRYAN A. GARNER,

---

[8] We have some doubt that the term is quite so limited. *Cf. Smuggling*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The crime of importing or exporting illegal articles or articles on which duties have not been paid."); *Smuggling*, BALLENTINE'S LAW DICTIONARY (3d ed. 2010) ("The criminal offense of knowingly and willfully, with intent to defraud the United States, clandestinely introducing into the United States any merchandise which should have been declared for customs duty."); *Smuggle*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2019) ("To bring into a country (a prohibited item) secretively and intentionally in violation of the law.").

READING LAW: THE INTERPRETATION OF LEGAL TEXTS 221 (2012). But a title cannot override the statutory text itself. *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947). Although § 545—true to its title—outlaws smuggling goods into the United States, the statute also criminalizes the fraudulent or knowing importation of "merchandise contrary to law." Lee's construction of that language as equating with "smuggling" renders the two provisions of § 545 duplicative, a heavily disfavored result. *Kungys v. United States*, 485 U.S. 759, 778 (1988) (discussing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"); *see also* SCALIA & GARNER, *supra*, at 175. The better reading of the second paragraph of § 545 is that it makes it a crime to fraudulently or knowingly import merchandise in any manner contrary to law. Section 545's title cannot save Lee from its text.

Lee next argues the case law is on his side. He claims the cases only address scenarios where the defendant imported goods that are illegal per se—barred entirely from importation into the United States. That might be true, but it would not change the meaning of § 545. The scope of a statute cannot be altered based on the fact patterns of cases that happen to be charged and end up in the Federal Reporter. In any event, Lee's assertions about the state of the case law are inaccurate. His cited authorities, *Babb v. United States*, 218 F.2d 538 (5th Cir. 1955) and *Steiner v. United States*, 229 F.2d 745 (9th Cir. 1956), dealt with indictments that failed to identify an underlying violation to serve as the predicate for § 545 liability. The indictments simply lacked any predicate offense undergirding the § 545 charge. We do not have that here: the government's indictment specifically accused Lee of violating § 1304(a).

And despite Lee's attempts, we do not see how this case is distinguishable from *United States v. Kuipers*, 49 F.3d 1254 (7th Cir. 1995).[9] In *Kuipers*, we affirmed the defendant's § 545 conviction for attempting to import the horns of a protected species under false paperwork. *Id.* at 1256. It was legal to import the horns into the United States with the proper paperwork, but the defendant used forged documentation to circumvent the law. Here, Lee essentially did the same thing. Nothing prohibited Lee from importing turbo blowers into the United States, but he needed to do so with a proper country-of-origin designation under § 1304(a). Lee circumvented that requirement in a fraudulent fashion, similar to the defendant in *Kuipers*.

Lee also claims he could not have violated § 545 because U.S. Customs detained the turbo blowers at the border, such that the machines were never imported into the country. But Lee fails to provide any reason to exclude domestic U.S. Customs facilities from the definition of the "United States," as used in § 545. If anything, the text supports the opposite conclusion, specifically excluding other areas but not U.S. Customs offices. 18 U.S.C. § 545 ("The term 'United States', as used in this section, shall not include the Virgin Island, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or Guam."); *see also* 19 U.S.C. § 1304(j) (referring to merchandise held by U.S. Customs for inspection as an "imported article").

---

[9] Lee's claim that *Kuipers* dealt with only the first paragraph of § 545, and not the second, is not correct. 49 F.3d at 1256 ("Kuipers was indicted on March 1, 1994 for … (2) fraudulently and knowingly importing the Desert Bighorn Sheep into the United States contrary to law (18 U.S.C. § 545) … .").

Lee notes that federal law allows mismarked goods, after their markings are corrected, to be imported. 19 U.S.C. § 1304(j); *see also* 19 C.F.R. § 134.51. He emphasizes that § 1304 does not itself purport to criminalize mismarking a product's country of origin, despite providing criminal sanctions for other violations. 19 U.S.C. § 1304(l) (penalizing anyone who "defaces, destroys, removes, alters, covers, obscures, or obliterates" a country-of-origin mark with intent to conceal that information). Yet one federal statute does not preempt another. *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004). Section 1304(l)'s silence cannot override the text of § 545. The fact § 1304(l) does not separately criminalize conduct already outlawed under § 545 is not a basis for limiting the scope of § 545. *Cf. United States v. Hassanzadeh*, 271 F.3d 574, 576–79 (4th Cir. 2001) (affirming § 545 conviction based on underlying § 1304 labeling violation).[10]

Finally, Lee claims treating § 1304 violations as predicate offenses for § 545 liability will criminalize a vast array of innocent behavior in international commerce. This policy argument fails to account for § 545's high scienter bar—fraudulent or knowing misbehavior. Such a scienter requirement ensures

---

[10] Lee's invocation of *United States ex rel. Huangyan Import v. Nature's Farm Prods.*, 370 F. Supp. 2d 993 (N.D. Cal. 2005), is not well received, particularly his selective and misleading quotation. Although the opinion states federal regulations "permit the importation of mismarked goods," Lee leaves out the important qualifying language about the monetary penalties imposed in such circumstances. *Id.* at 1001. And, as the underlying statute makes clear, goods originally mismarked upon arrival may be withheld until their country-of-origin markings are corrected. 19 U.S.C. § 1304(i)–(j). Nothing in the *Huangyan Import* opinion suggests that attempting to import merchandise with false country-of-origin designations is anything but "contrary to law."

the statute does not criminalize innocent commercial mistakes. *See Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) ("The cases in which we have emphasized scienter's importance in separating wrongful from innocent acts are legion."). And this case involves no mere administrative oversight. KTurbo's mislabeling served an important function in Lee's broader scheme to deceive KTurbo customers about the origin of the turbo blowers.

For all these reasons, we affirm Lee's three smuggling convictions.

Having affirmed all Lee's convictions, we now proceed to the sentencing issues presented by the parties. We first address the government's cross-appeal regarding Lee's prison sentence, before resolving Lee's challenge to the restitution ordered by the district court.

### C. The Government's Cross-Appeal

The government asks us to reinstate the 20-month sentence the district court originally imposed. It claims the district court lacked authority under FED. R. CRIM. P. 35(a) to reduce Lee's sentence to 12 months. But before we reach the merits of the government's cross-appeal, we must resolve two jurisdictional questions.

### 1. Is there statutory jurisdiction for the government's cross-appeal?

The government may appeal an adverse decision in a criminal case only if expressly authorized by statute. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977). Here, the government cites 18 U.S.C. § 3731. But that provision does not apply—the government is not appealing a dismissal of its indictment, a new trial order, or any of the other issues listed

in § 3731. *See United States v. Spilotro*, 884 F.2d 1003, 1005–06 (7th Cir. 1989) (holding § 3731 does not provide jurisdiction for appeals challenging "a district court order reducing a sentence"); *see also* CHARLES ALAN WRIGHT, ET AL., 15B FED. PRAC. & PROC. § 3919.8 (2d ed. April 2019 supp.) ("Ordinarily the government cannot rely upon either § 1291 or § 3731 to support appeal from a criminal sentence … .").

The relevant statute is 18 U.S.C. § 3742(b), which authorizes the government to appeal a defendant's sentence on specific grounds. A district court's modification of a sentence without authority to do so, as the government argues here, is one such ground. 18 U.S.C. § 3742(b)(1) (providing the government the ability to appeal sentences "imposed in violation of law"). The government's errant citation is not insignificant, given that timeliness is an issue for its cross-appeal (as discussed below). Section 3731 contains a 30-day deadline for filing a notice of appeal that § 3742(b) lacks. *See* CHARLES ALAN WRIGHT, ET AL., 16A FED. PRAC. & PROC. § 3950.8 (4th ed. April 2019 supp.); *see also In re Grand Jury Proceedings*, 616 F.3d 1186, 1195–99 (10th Cir. 2010) (discussing the interplay between § 3731 and FED. R. APP. P. 4(b)). Nevertheless, where the record provides enough information to establish appellate jurisdiction, we may exercise such jurisdiction despite the parties' failure to direct us to its proper statutory source. *See NewPage Wis. Sys. Inc. v. United Steel Workers Int'l Union*, 651 F.3d 775, 778 (7th Cir. 2011) (if the jurisdictional statute cited by a party is inaccurate, the "court still must inquire whether another statute supplies jurisdiction"); *see also In re Sealed Case*, 449 F.3d 118, 121 (D.C. Cir. 2006) (holding the appellant's failure

to cite § 3742, "while bothersome to a court, is not necessarily fatal").

One issue remains: Section 3742(b) requires the government to obtain "the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General" in order to appeal. Because the government did not rely on § 3742(b) in its briefing, it has not provided proof of its compliance with that statutory requirement. But our circuit precedent does not treat § 3742(b)'s approval requirement as jurisdictional. *United States v. Hendrickson*, 22 F.3d 170, 172 n.1 (7th Cir. 1994).[11] Nothing in the record suggests the government lacks authorization to pursue its cross-appeal, and Lee never raised the issue.

---

[11] *See also United States v. Jackson*, 544 F.3d 1176, 1181–82 (11th Cir. 2008) (personal approval requirement in § 3742(b) is non-jurisdictional), *abrogated on different grounds by United States v. DiFalco*, 837 F.3d 1207, 1216 (11th Cir. 2016); *United States v. Ruiz-Alonso*, 397 F.3d 815, 818 (9th Cir. 2005) (same); *United States v. Zamudio*, 314 F.3d 517, 520 (10th Cir. 2002) (same); *United States v. Gonzalez*, 970 F.2d 1095, 1102 (2d Cir. 1992) (same); *but see United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) (per curiam) (dismissing the government's sentencing appeal for failure to establish the requisite approval); *United States v. Smith*, 910 F.2d 326, 328 (6th Cir. 1990) (holding the approval is not jurisdictional but requiring proof that it has been obtained as part of the court's "exercise of its supervisory authority"); *cf. Greenlaw v. United States*, 554 U.S. 237, 246 (2008) (explaining that an appellate court may not increase a defendant's sentence absent a cross-appeal because "Congress … entrusted to named high-ranking officials within the Department of Justice responsibility for determining whether the Government, on behalf of the public, should seek a sentence higher than the one imposed").

### 2. Did the government file its notice of appeal in time?

The next jurisdictional question concerns the timeliness of the government's notice of appeal. In a criminal case like this, FED. R. APP. P. 4(b)(1)(B) provides the government's deadline:

> When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days of the later of:
>
> (i) the entry of the judgment or order being appealed; or
>
> (ii) the filing of a notice of appeal by any defendant.

The government must file its own notice of appeal to pursue a sentencing increase following a conviction; it cannot piggyback on the defendant's notice. *Greenlaw*, 554 U.S. at 252–53.

Here, the relevant timeline looks like this:

- February 28, 2018: The district court orally sentenced Lee to 20 months in prison.

- March 11, 2018: Lee filed his first notice of appeal and a Rule 35(a) motion to correct his sentence.

- March 14, 2018: The district court modified Lee's sentence to 12 months in prison and entered its written judgment.

- March 28, 2018: Lee filed his second notice of appeal.

- April 27, 2018: The government cross-appealed.

The government does not rely on the date of judgment under Rule 4(b)(1)(B)(i). It cannot, as it filed its notice of appeal 45 days after the district court's judgment. But what about

Rule 4(b)(1)(B)(ii)? The government's notice of appeal came 30 days after Lee's second notice of appeal, but 48 days after Lee's first notice. Which of Lee's notices triggered the government's deadline clock?

As with any matter of statutory interpretation, the text controls. *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512–13 (2019); *see also* SCALIA & GARNER, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). Notably, Rule 4(b)(1)(B)(ii) refers to "a notice of appeal by any defendant" rather than "the first notice of appeal by any defendant." That is important because the analogous rule for civil cases triggers a party's deadline to initiate a cross-appeal on "the date when *the first notice* [of appeal] was filed … ." FED. R. APP. P. 4(a)(3) (emphasis added). The drafters could have used the same language for the criminal rule, but they chose different words. We must respect that decision and give such variations effect. *Murphy v. Smith*, 138 S. Ct. 784, 787–88 (2018); *see also* SCALIA & GARNER, *supra*, at 170 ("[A] material variation in terms suggests a variation in meaning.").

Lee offers no persuasive reason to interpret "a notice of appeal by any defendant" to mean "the first notice of appeal by any defendant." The text of the rule already contemplates there may be multiple notices of appeal, and it allows the government to file its cross-appeal within thirty days of the "later of" such notices. The only authority Lee offers, *Cyrak v. Lemon*, 919 F.2d 320 (5th Cir. 1990), is a civil case addressing Rule 4(a), which expressly refers to the "first notice." Rather than simply analogize criminal cases to civil cases, as Lee asks us

to do, we give effect to the different text of the different provisions and apply the rules as written.

Rule 4(b) permits the government to file its notice of appeal within thirty days of "a notice of appeal by any defendant." Lee timely filed "a notice of appeal" on March 28, 2018. And the government filed its notice exactly thirty days later, on April 27, 2018, so the government's appeal is timely under the plain meaning of FED. R. APP. P. 4(b)(1)(B)(ii).

### 3.  In reducing Lee's sentence, did the district court exceed its authority?

Now we arrive at the substance of the government's cross-appeal. The government claims district courts lack authority to revisit advisory guideline calculations on a motion brought under FED. R. CRIM. P. 35(a). It does not challenge the merits of the district court's ruling, only the court's authority to make it. Rule 35(a) states: "Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error."

In sentencing Lee, the district court struggled with how to calculate the "loss" caused by Lee's crimes for purposes of U.S.S.G. § 2B1.1. Where the loss cannot be determined, the Guidelines permit courts to look at the defendant's gain as an alternative. U.S.S.G. § 2B1.1 app. n. 3(B). The district court originally found Lee's gain to be the $180,392 in Recovery Act funds paid to KTurbo by municipalities. That put Lee's guideline range at 46–57 months, although the district court departed down from that range and sentenced Lee to 20 months.

The district court abandoned that math on Lee's Rule 35(a) motion. Based on *United States v. Giovenco*, 773 F.3d 866, 871 (7th Cir. 2014), the court determined it needed to assess net

profit, rather than KTurbo's gross revenue, and that it lacked the evidentiary record to do so. It therefore decided not to apply any sentencing enhancement based on Lee's gain under U.S.S.G. § 2B1.1. Using a guideline range of 12–18 months, the court sentenced Lee to 12 months plus one day.

The government emphasizes that a district court's authority on a Rule 35(a) motion is "narrow." As we have said, the "Rule does not give the district court a second chance to exercise its 'discretion with regard to the application of the sentencing guidelines,' nor does it allow for changes to a sentence based on the court's change of mind." *United States v. Clark*, 538 F.3d 803, 809 (7th Cir. 2008) (quoting FED. R. CRIM. P. 35 advisory committee's note to 1991 amendments). Still, Rule 35(a) is not the straitjacket the government suggests. It does allow district courts to correct "clear errors" and avoid wasteful appeals by fixing obvious sentencing issues. *United States v. Schenian*, 847 F.3d 422, 424 (7th Cir. 2017). This extends to clear errors that produce mistakenly high sentences. *Id.* If the judge identifies an aspect of the sentence that is objectively erroneous—whether on a factual matter or a point of law—the judge may use Rule 35(a) to address the problem.

Here, the district court realized that its gain calculation needed to assess net profit, not gross revenue, *see Giovenco*, 773 F.3d at 871, and that it lacked an evidentiary basis to do so. It also determined nothing in the record showed how much Lee personally gained from KTurbo's sales. The government bore the burden to establish a "loss" or "gain" under U.S.S.G. § 2B1.1. *United States v. Johns*, 686 F.3d 438, 454 (7th Cir. 2012). Sentencing Lee without a supporting evidentiary record would have constituted clear error. *Id.* at 456–57. Rule 35(a)'s entire purpose is to correct errors otherwise destined

to be reversed. *Schenian*, 847 F.3d at 424; *Clark*, 538 F.3d at 809. The district court was thus well within its authority to modify Lee's sentence on his Rule 35(a) motion.

### D. Restitution

Finally, we return to Lee's appeal, specifically his challenge to the restitution ordered by the district court.

Under the Mandatory Victims Restitution Act, courts must order restitution to any victim of "an offense against property under this title, … including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The statute sets the restitution amount at the value of the victim's lost property on the date of loss or the date of sentencing (whichever is greater) minus the value of any returned property. 18 U.S.C. § 3663A(b)(1)(B); *see also United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014).

On appeal, Lee objects to paying any restitution, denying that any municipality sustained a loss. He acknowledges that two municipalities, Mishawaka, Indiana and Redmond, Oregon, paid KTurbo a total of $180,392 for turbo blowers manufactured in South Korea. But Lee points out that the EPA subsequently authorized Mishawaka and Redmond to continue using the KTurbo blowers without returning the Recovery Act funds. So Lee argues neither municipality sustained any loss: each paid for turbo blowers to use on its project, and each received turbo blowers that it is using on its project.

But Lee waived this argument in the district court. The probation office recommended the court order $180,392 in restitution based on the sums paid by Mishawaka and

Redmond.[12] The government agreed with probation's recommendation. Despite the fact the district court held three sentencing hearings, Lee failed to raise the issue of restitution, even once. Lee failed to object in his written sentencing memorandum, and he failed to raise the issue in his Rule 35(a) motion. Indeed, Lee's entire argument regarding restitution in the district court comprised two sentences in a supplemental brief requested by the court on a different topic, with no citations to any statutory authority or case law supporting his position.[13] That is insufficient to preserve an objection.

The closer question is whether Lee affirmatively waived the restitution arguments he now pursues on appeal, or whether he only forfeited them. Waiver requires the intentional relinquishment of a known right, while forfeiture is a mere accidental or neglectful failure to assert a right. *United States v. Hathaway*, 882 F.3d 638, 641 (7th Cir. 2018). The distinction is important, as waiver precludes appellate review altogether, while forfeited rights may be vindicated on appeal through plain-error review. *Id.* In making this determination,

---

[12] Neither of these municipal contracts served as a basis for any of the five counts of wire fraud in the indictment. Ordinarily restitution is limited to the losses caused by the specific conduct underlying the defendant's convictions. *United States v. Locke*, 759 F.3d 760, 765 (7th Cir. 2014). But where the offense "involves as an element a scheme, conspiracy, or pattern of criminal activity," such as the scheme to defraud necessary for a wire fraud conviction, the applicable statute permits courts to award restitution to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2).

[13] In the district court Lee argued: "Since the loss amount is zero, the restitution amount is also zero. And the government's motion to use Heon Seok Lee's bond deposit to pay restitution (Dkt # 239) should therefore be denied."

we look to whether the defendant "chose, as a matter of strategy, not to present the argument." *Id.* (quoting *United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009)).

After reviewing the extensive sentencing transcripts in this case, we conclude Lee and his counsel made a strategic decision to not press objections to restitution in the district court, and thus waived the issue. The main event during the sentencing was the loss calculation under U.S.S.G. § 2B1.1. Yet restitution did come up. At the first hearing, Lee's counsel interjected, "I would also just note since restitution is brought up—been brought up, that the restitution amount I don't think needs to be above 180." Rather than argue the district court should not order restitution because there was no loss, as he does now, Lee asked the district court to not go above the $180,392 figure recommended by the probation office.[14] Although Lee did include a two-sentence objection to restitution in his supplemental memorandum before the second hearing, he never raised the issue at the second hearing itself, despite the prosecution addressing the topic. Lee never mentioned restitution in his Rule 35(a) motion. And, at the third sentencing hearing, when the district court noted its intention to enter the same $180,392 in restitution (despite reducing Lee's prison term on account of the government's failure to prove the loss amount), Lee's counsel represented, "I think that's correct as to what should—what would be in the judgment." These repeated decisions to press other arguments, and not address restitution, evinced a "tactical choice" on

---

[14] Lee made this point in the context of a debate about whether the loss figure under the Sentencing Guidelines should be the $1.6 million face value of KTurbo's Recovery Act contracts. Lee's incentive to push the district court toward a figure substantially lower than that was clear.

Lee's part, constituting waiver. *United States v. Jin Hua Dong*, 675 F.3d 698, 702 (7th Cir. 2012).

We realize there is some logical tension between the district court's restitution award, and its conclusion that it lacked a sufficient evidentiary basis to determine victims' "loss" for purposes of U.S.S.G. § 2B1.1.[15] But the appropriate forum for addressing that issue was the district court in the first instance. Calculating restitution in an atypical fraud case such as this one is difficult, as the losses caused by a scheme to circumvent governmental purchasing preferences are "inherently difficult to quantify." *United States v. Leahy*, 464 F.3d 773, 794 (7th Cir. 2006). The district court was entitled to the benefit of the parties' best arguments on how restitution should be calculated. By strategically choosing to forego his challenge to the restitution figure in the district court, Lee waived the issue: "A defendant cannot squirrel away objections, revealing them only upon successive appeals." *Kuipers*, 49 F.3d at 1258.

### III. Conclusion

Heon Seok Lee repeatedly lied about where his company manufactured its products in order to profit off a federal stimulus package. Such a fraudulent scheme is wire fraud and prohibited by 18 U.S.C. § 1343. To execute his scheme, Lee directed his company to mislabel the country of origin for its

---

[15] Although the restitution amount typically tracks the loss amount under the Sentencing Guidelines, *United States v. McGee*, 612 F.3d 627, 635 (7th Cir. 2010), courts must be careful not to confuse the two given the differences between the definitions of "loss" under U.S.S.G. § 2B1.1 and restitution under 18 U.S.C. § 3663A(b)(1)(B). *United States v. Hussein*, 664 F.3d 155, 161 n.2 (7th Cir. 2011) ("The amount of restitution does not always correspond to guidelines loss because the rules for calculating each differ.").

products and attempt to import them with those incorrect designations. This violated 19 U.S.C. § 1304(a) and the federal prohibition against smuggling, 18 U.S.C. § 545, and evidence supported the jury's verdict on those counts. As to Lee's sentence, although the government timely appealed, the district court did not exceed its authority when it revisited Lee's sentencing guidelines range and modified Lee's prison sentence accordingly. Finally, Lee waived any objection to how the district court calculated restitution. We therefore AFFIRM the judgment of the district court in full.