In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 21-3370

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER ARMBRUSTER,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:18-cr-00130 — **Matthew F. Kennelly**, *Judge.*

_____

ARGUED AUGUST 3, 2022 — DECIDED SEPTEMBER 7, 2022

_____

Before SYKES, *Chief Judge*, and SCUDDER and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Peter Armbruster, former Chief Financial Officer of Roadrunner Transportation Systems, Inc., a public company, went to trial on criminal charges of securities fraud, falsifying accounting records, and related counts. The jury returned a mixed verdict, acquitting him on 11 counts but convicting on the remaining four. Armbruster now challenges those convictions, contending that insufficient evidence

supports the adverse verdicts. While the case against Armbruster may not have been open-and-shut, a rational jury could have concluded that the government presented enough evidence to support guilty verdicts on the challenged counts. Because the law requires no more, we affirm.

## I

## A

Armbruster, a Certified Public Accountant with prior experience working at a Big Four accounting firm, began serving as the controller for Dawes Transportation in 1990. When Dawes merged with Roadrunner in 2005, Armbruster stayed on as Roadrunner's Chief Financial Officer. In the years that followed, Roadrunner grew rapidly, acquiring nearly 30 transportation companies and going public in 2010. Armbruster's responsibilities as CFO included the preparation, certification, and filing of Roadrunner's consolidated financial statements with the Securities and Exchange Commission. The company's financial statements—consolidated as they were—effectively incorporated the financial affairs of certain of Roadrunner's subsidiaries, including Morgan Southern, a Georgia-based transportation company.

Consolidating Morgan Southern's financial statements proved challenging. At the time of its acquisition by Roadrunner, Morgan Southern's own accounting practices were lagging, with the company not regularly reconciling account balances and lacking adequate staffing.

In 2014, Roadrunner's then-controller, Brock Even, recognized these shortcomings and spearheaded an effort to examine the accuracy and integrity of Morgan Southern's financial accounting and reporting practices. Even enlisted help from

two of Roadrunner's then-departmental controllers, Bret Naggs and Mark Wogsland, who traveled to Morgan Southern's home office in Georgia to examine the company's books and records.

In November 2014 Stephen Voorhees became Morgan Southern's controller. Balance sheet review was a key priority for him in that position. But when Voorhees left Roadrunner in April 2016, many deficiencies in Morgan Southern's accounting remained unresolved. On his way out, Voorhees conveyed his key concerns and findings to a group of Roadrunner accountants, with Armbruster too receiving the information.

This is where the particulars start to matter. Voorhees found that Morgan Southern had inflated its balance sheet by at least $2 million and perhaps as much as $4–5 million. The overstatement was in part the product of the company carrying a receivable from IKEA Maersk above its net realizable value—above the amount Morgan Southern could reasonably expect to collect. And so too did Voorhees find that Morgan Southern continued to report (as an asset on its balance sheet) prepaid taxes when, in fact, the underlying taxes were due and owing. These circumstances required the two account balances to be reduced, which, in turn, would have resulted in an expense against Morgan Southern's income. It was these two accounting items that would become a major problem for Armbruster.

After Voorhees's departure in April 2016, Morgan Southern hired Christopher Lacey as its new controller. Lacey promptly noticed the company's accounting problems, including the overstatement of the IKEA Maersk receivable and prepaid taxes account, and relayed his concerns up to

Roadrunner's vice president of finance Heather Hipke and new Chief Operating Officer Mike Gettle. Hipke and Gettle reacted with similar trepidation and raised their own concerns with Armbruster in the third quarter of 2016.

On November 14, 2016, Roadrunner filed its 2016 third quarter Form 10-Q with the SEC. The filing included the company's consolidated financial statements, which reflected no adjustments of the carrying values of the two Morgan Southern balance sheet items and, it would turn out, other misstatements. In short, Roadrunner's financials did not comply with generally accepted accounting principles, often shorthanded GAAP.

Shortly after that third-quarter filing, Curt Stoelting (who, by this point, was Roadrunner's Chief Executive Officer) learned through Gettle of the misstatements in Roadrunner's financial statements. Stoelting too reacted with alarm and promptly informed Roadrunner's Board of Directors. From there the dominoes started to fall: Roadrunner informed its independent auditor, Deloitte & Touche LLP, of the material misstatements in the third-quarter financial statements. And on January 30, 2017, Roadrunner filed a Form 8-K informing investors that they could no longer rely on any of the company's financial filings from 2014 or 2015 or its quarterly reports for the first three quarters of 2016. Roadrunner's share price dropped significantly over the next few days. In January 2018 the company filed restated financial statements, reporting a decrease of approximately $66.5 million in net income over the misstated periods. Roadrunner's share price plummeted again and in time criminal charges followed.

B

Most relevant here are the criminal charges ultimately brought against Armbruster and two former departmental controllers, Bret Naggs and Mark Wogsland, alleging various forms of securities and accounting fraud. An 11-day jury trial ensued in federal court in Milwaukee in July 2021, with the government presenting witness testimony from past and present Roadrunner associates and providing the jury with a range of documentary evidence, including emails to and from each defendant and related financial analyses from the relevant periods. In the end, the jury returned a mixed verdict, acquitting Naggs and Wogsland on all counts but convicting Armbruster on four of the 11 charges brought against him.

Armbruster's convictions came on two counts of knowingly falsifying Roadrunner's accounting records by materially misstating the carrying values of the Morgan Southern IKEA Maersk receivable and prepaid taxes account, 15 U.S.C. §§ 78m(b)(2), (5), *id.* § 78ff(a), 18 U.S.C. § 2 (Counts Six and Seven); one count of fraudulently influencing Deloitte & Touche LLP, Roadrunner's external auditor, by submitting a false and misleading management representation letter relating to the third quarter of 2016, 15 U.S.C. § 78ff(a), 18 U.S.C. § 2 (Count Five); and one count of filing fraudulent financial statements with the SEC relating to that same quarter, 18 U.S.C. §§ 1348, 2 (Count Thirteen).

Armbruster reacted to the jury's decision by invoking Federal Rule of Criminal Procedure 29(c), arguing that the trial evidence was insufficient, and asking the district court to enter a judgment as a matter of law in his favor on all counts of conviction and to set aside the adverse verdicts. He contended that the government did no more than prove corporate

accounting mistakes, not deliberate fraud on his part. The district court denied the motion, reasoning that the government had presented enough evidence for the jury to reach contrary conclusions.

## II

Armbruster's appeal is limited. He challenges only the district court's denial of his post-verdict motion under Rule 29(c) contesting the sufficiency of the government's evidence on each count of conviction. But he faces "a nearly insurmountable hurdle" succeeding with this challenge, for "we defer heavily to the jury's findings and review evidence in the light most favorable to the government" and will "reverse only where no rational trier of fact could have found the defendant guilty." *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (cleaned up).

### A. Falsifying Books and Records

Counts Six and Seven of the operative indictment charged Armbruster with making false entries in the books, records, and accounts of a public company—Roadrunner. The district court instructed the jury that to sustain a conviction on these two counts, the government had to prove the following four elements beyond a reasonable doubt: that (1) Roadrunner was required to file reports with the SEC and to keep accurate books and records, including as to the financial affairs of Morgan Southern, a consolidated subsidiary; (2) Armbruster falsified or directed someone to falsify the account balances in question, namely the IKEA Maersk receivable (Count Six) and the prepaid taxes account (Count Seven); (3) those accounts were required to accurately and fairly reflect Roadrunner's financial state; and (4) Armbruster acted knowingly and

willfully in falsifying the two accounts in question. See 15 U.S.C. §§ 78m(b)(2), (5), *id*. § 78ff(a), 18 U.S.C. § 2.

The government's evidence came on many fronts. First, the jury heard from several witnesses, ranging from analysts who reported to Armbruster to executives who were his peers, regarding his awareness of the Morgan Southern balance sheet problems. These witnesses explained that, as early as 2014, Armbruster had the information he needed to know that the accounts in question were materially overstated and needed to be written down, by establishing a reserve or recording a write off—either way resulting in Morgan Southern (and, by extension, Roadrunner) taking a charge against income. They also expressed the view that Armbruster, as Roadrunner's CFO, shouldered ultimate responsibility for the decision to continue to carry both accounts at the overstated amounts.

One such witness was Stephen Voorhees, Morgan Southern's former controller who oversaw the attempts to help shore up its accounting practices during the relevant periods. Voorhees told the jury that he informed Armbruster of the results of his assessment of Morgan Southern's accounting practices, including its overstatement of the collectability of the IKEA Maersk receivable and inflation of the prepaid taxes account. He added that Armbruster participated in calls, email exchanges, and meetings where Morgan Southern's accounting was discussed. Even more, Voorhees walked the jury through Roadrunner's plan to write off the uncollectable and overstated account balances over time, describing email threads with Armbruster that discussed the need to record material adjustments to both accounts.

The jury also heard the testimony of Heather Hipke, Road-runner's vice president of finance who worked alongside Armbruster. Hipke explained that she provided Armbruster with the results of Christopher Lacey's efforts to reconcile particular Morgan Southern accounts, including the IKEA Maersk receivable and prepaid taxes account. She told the jury that around the time the findings of Morgan Southern's accounting troubles came to light, Roadrunner was under meaningful pressure from its bank and debt servicer to demonstrate financial soundness. Much like Voorhees, Hipke stated that final responsibility for Roadrunner's accounting and financial reporting rested with Armbruster as the company's CFO.

Perhaps even more damaging was Hipke's testimony about a November 2016 meeting—the so-called whiteboard meeting. This meeting occurred shortly before Armbruster submitted a letter to Deloitte representing that he had no knowledge of material misstatements or irregularities in Roadrunner's financial accounting and reporting. At that meeting, Mike Gettle, then Roadrunner's executive vice president, listed on a whiteboard the many accounting challenges the company faced, including those with respect to Morgan Southern accounts receivable and prepaid taxes. He then emphasized the need to make adjustments to allow the company to report both account balances in accordance with GAAP. Part of the government's evidence was a photo taken of the whiteboard itself, which showed Gettle's handwritten charting of Roadrunner's pressing accounting problems, including the overstated carrying values of the two Morgan Southern accounts.

Hipke's testimony went even further. She explained to the jury how she had been feeling frustrated for some time at Armbruster's apparent lack of concern with resolving Roadrunner's accounting problems. By her account, Armbruster repeatedly kicked the can down the road—every time Morgan Southern's problems were raised, he asked for more diligence instead of addressing the issue by adjusting the unsupported carrying values of the assets in question.

Hipke was not the only witness to tell the jury that Roadrunner waited too long to record the necessary adjustments to the Morgan Southern accounts. Multiple other witnesses, from a financial analyst to Christopher Lacey (Morgan Southern's former controller), testified that Roadrunner persisted during the relevant periods with overstating the account balances. These witnesses strongly suggested all of this occurred with Armbruster's knowledge.

To fortify its case against Armbruster, the government introduced into evidence various documents speaking to his knowledge of Roadrunner's accounting for the Morgan Southern items in question. One set of documents consisted of an email and attachments that Armbruster forwarded from his Roadrunner email account to his personal account in November 2016. The email showed that earlier that month—around the time Mike Gettle held the whiteboard meeting identifying, among other accounting concerns, the Morgan Southern balance sheet items—Armbruster had found a 2014 email informing him of the overstatements with the exact two accounts in question. The 2014 email, in short, showed that Armbruster knew for some time that Roadrunner's consolidated balance sheet overstated the carrying values of the two assets in question.

The government also presented even more specific email chains from 2014 to 2016 that included Armbruster and entailed other Roadrunner accountants discussing the need to adjust the IKEA Maersk and prepaid tax accounts. To be sure, some of the emails reflected only discussions about Morgan Southern's accounting problems. But others specifically identified and discussed the overstatements in the carrying values of the IKEA Maersk receivable and prepaid taxes. While the government did not present direct evidence that Armbruster read these emails, everyone agreed that he received them.

Consider, for example, a May 2014 email from Connor Kursel, a Roadrunner financial analyst, to a group of accountants, including Armbruster. Attached to the email was a spreadsheet with the notation "probably a full write off" next to the IKEA Maersk receivable line item. Other email chains showed Roadrunner accountants discussing the need to adjust the Morgan Southern accounts, including one exchange from Bret Naggs confirming that Armbruster had the ultimate decision-making authority and had directed an accountant not to record any write downs to the account balances as they stood in June 2015.

All of this evidence was enough to support the jury's verdict on the Counts Six and Seven books and records charges. Given the corroboration from various sources of evidence, from the multiple witnesses at different levels of Roadrunner's accounting and finance department to the documents spanning several years, the jury could—and did—reasonably find that Armbruster knowingly and willfully allowed the Morgan Southern IKEA Maersk receivable and prepaid taxes account to remain overstated in the company's accounting

records and, in turn, in Roadrunner's consolidated balance sheet during the relevant periods.

B. Securities Fraud

Count Thirteen charged Armbruster with violating the federal securities laws by making false and misleading statements to Roadrunner shareholders about the company's financial condition in its third quarter 2016 Form 10-Q. The district court instructed the jury that to prove the allegations in Count Thirteen the government had to prove these three elements beyond a reasonable doubt: that (1) there existed a scheme or artifice to defraud Roadrunner's shareholders, independent auditors, regulators, lenders, and the investing public about the company's stock; (2) Armbruster knowingly executed that scheme; and (3) he acted with the intent to deceive and cheat. See 18 U.S.C. §§ 1348, 2.

The government relied on much of the evidence supporting the Counts Six and Seven books and records charges to prove the Count Thirteen securities fraud charge. No more evidence was required. The jury had enough to conclude that Armbruster knowingly allowed the company's 3Q-2016 financial statements to include material misstatements by leaving the Morgan Southern IKEA Maersk and prepaid tax accounts overstated, as reflected in Roadrunner's consolidated financial statements.

On this charge, too, the jury could have afforded great weight to Heather Hipke's testimony about the November 2016 whiteboard meeting. She explained that Armbruster attended the meeting and that the group's discussion addressed multiple accounting issues, including the two assets at Morgan Southern. The jury could therefore reasonably infer that,

by attending the meeting, Armbruster—as Roadrunner's CFO—was well aware of these accounting matters. The jury also heard testimony from a Roadrunner investor who explained feeling misled by the company's reporting of its financial condition and results of operations in the 3Q-2016 Form 10-Q.

C. Fraudulently Influencing Accountants

Finally, Count Five charged Armbruster with misleading Roadrunner's external auditor by supplying Deloitte & Touche with a false management representation letter. The district court instructed the jury that this charge required the government to prove the following five elements: that (1) Roadrunner was an issuer of securities required by law to file reports with the SEC; (2) Armbruster was an officer (such as a principal financial or accounting officer) of Roadrunner; (3) he directly or indirectly coerced, misled, manipulated, or fraudulently influenced Deloitte, an independent public or certified public accountant, while it was engaged in an audit or review of Roadrunner's financial statements; (4) he misled Deloitte knowing that his actions could result in filing materially misleading financial statements; and (5) he acted knowingly and willfully. See 15 U.S.C. § 78ff(a), 18 U.S.C. § 2; see also 17 C.F.R. § 240.13b2–2(b).

As with many of the other charges, Armbruster did not contest the sufficiency of government's proof on many elements of Count Five. Foremost, he did not dispute that, as Roadrunner's CFO, he signed the November 14, 2016 letter to Deloitte representing that he had provided accurate and complete information about the company's financial condition as of September 30, 2016. Accordingly, the government's focus at trial was on showing that Armbruster deliberately withheld

from Deloitte information about the overstated Morgan Southern balance sheet items.

A rational jury could have concluded that the government proved this charge beyond a reasonable doubt. Go back once again to Heather Hipke's testimony and, in particular, her recounting for the jury discussions with Armbruster prior to his signing the 3Q-2016 management representation letter. She described the conversations, including the November 2016 whiteboard meeting, in which accountants discussed with Armbruster their concerns about many aspects of Roadrunner's accounting, including the Morgan Southern issues.

For his part, Deloitte's audit partner, Adam Krasnoff, testified that he would have expected to learn of the concerns Armbruster, Hipke, and Gettle harbored with respect to Roadrunner and Morgan Southern's overstated account balances. Krasnoff explained that he was alarmed to learn about the whiteboard meeting and related email correspondence.

Lastly, the government went even further by presenting exhibits and drawing out testimony establishing Armbruster's vast accounting experience. This testimony would have allowed the jury to infer that Armbruster understood his responsibility to communicate honestly with auditors and that he knowingly shirked his duty by signing a management representation letter that failed to notify Deloitte of the clear concerns many within Roadrunner held about the two accounts in question. We have no difficulty seeing this evidence as sufficient under the deferential standard guiding our review on appeal.

**III**

Armbruster urges an altogether different perspective on the trial evidence. To his mind, the government's proof on the counts in question was too general—not specific enough to show that he knew of the exact balance sheet items at the heart of those charges. He emphasizes that, as CFO, he operated at a higher level, removed from the many details that often accompany financial accounting, and held only a broader view of Roadrunner's accounting practices, without any knowledge of highly particular concerns that others held about two relatively small accounts for just one of the company's many subsidiaries. He likewise observes that, as CFO, he received waves of emails with attachments, but that reality alone was not enough to establish that he ever learned of the specific problems at the heart of the counts of conviction. He adds that any decision not to write down the account balances aligned with his established practice of holding off on recording material adjustments until the company had a complete opportunity to analyze the accounts in question—work he says never finalized before 2017.

Armbruster's contentions run headlong into the highly deferential standard governing our review of the jury's contrary conclusions. We sit not to reweigh evidence, assess witness credibility, or assign probabilities to what perspective on the government's case was most persuasive. To the contrary, we must "construe the evidence in the light most favorable to the government" and "will reverse a conviction only where the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Godinez*, 7 F.4th 628, 638 (7th Cir. 2021) (cleaned up). Armbruster falls short of clearing this very demanding—indeed

"nearly insurmountable"—appellate hurdle. *United States v. Elizondo*, 21 F.4th 453, 470 (7th Cir. 2021).

The arguments Armbruster presses on appeal are the same ones he urged the jury to accept. And all throughout the trial he vigorously and extensively cross-examined witnesses to undermine the government's evidence, especially as to whether he harbored the requisite knowledge and intent for a conviction on any count. In the end, though, the jury found against him. And the jury's mixed verdict strongly suggests it parsed and weighed the evidence carefully, only to reach different conclusions on different counts.

Doubtless the government did not present the jury with a single piece of evidence in which Armbruster admitted to the fraud or otherwise was caught red-handed committing it. But the law did not impose that evidentiary burden on the government. Indirect evidence is allowed, and time and again we have recognized that the government can prove the mental state element of fraud charges with circumstantial evidence. See *United States v. Lundberg*, 990 F.3d 1087, 1095 (7th Cir. 2021) (emphasizing that intent to defraud may be proven by circumstantial evidence and the fair inferences drawn from such evidence); *United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017) ("Recognizing that it is usually difficult or impossible to provide direct evidence of a defendant's mental state, we allow for criminal intent to be proven through circumstantial evidence.") (cleaned up).

In the final analysis we see no reason to second guess the jury's decision and therefore AFFIRM.