In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-2254

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PATRICK D. THOMPSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 21-cr-00279-1 — **Franklin U. Valderrama**, *Judge.*

ARGUED APRIL 6, 2023 — DECIDED JANUARY 8, 2024

Before FLAUM, ST. EVE, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* A jury convicted Patrick Thompson of making false statements about his loans to financial institutions, and the district court ordered him to pay restitution to cover interest that he still owed. Thompson raises various issues on appeal. For the reasons stated below, we affirm.

## I.    BACKGROUND

This case arises out of statements that Patrick Thompson made about his loans to the Federal Deposit Insurance Corporation ("FDIC") and one of its loan servicers.

### A.  Loans

Thompson took out three loans from Washington Federal Bank for Savings ("Washington Federal"). The first came in 2011 when Thompson borrowed $110,000 to make an equity contribution to the law firm he had just joined. For this loan, Thompson signed a promissory note. The note referenced a "property address"—Thompson's residence—and stated that the loan was "secured" by this property. The second loan, taken out in 2013, was for $20,000 to pay off a tax bill. The third, obtained a year later, was for $89,000 to repay a debt to another bank. Thompson did not sign any paperwork for these last two loans. In total, Thompson borrowed $219,000.

Washington Federal's president told Thompson he owed that amount, plus interest, in a 2014 email. The email even contained a chart describing the breakdown:

```
$110,000.00  (Loan Amount)
    13,273.82 (Interest Amount)
$123,273.82
$ 20,000.00  (Loan Advance) 3-22-13
$143,273.82
$ 89,000.00  (Loan Advance)1-24-14
$232,273.82
```

Thompson later acknowledged that he owed $219,000, in addition to interest, on several occasions. In two separate loan applications in 2016, Thompson listed the outstanding

balance of his Washington Federal loan as $249,050. He also kept copies of these applications. The next year, Thompson received a tax statement from Washington Federal indicating that his outstanding balance was $249,049.96. He gave this form to his accountant and retained a copy in an envelope—on the back of which he wrote "Washington Fed $249,049.96?"

### B. Statements to Planet Home on February 23, 2018

Washington Federal failed in late 2017, at which point the FDIC became its receiver. This meant that the FDIC was responsible for recouping the money owed to Washington Federal before closing the bank down. To help with that task, the FDIC hired Planet Home Lending ("Planet Home")—a loan servicer.

Planet Home soon reached out to Thompson. It sent him an invoice in early 2018 showing that his Washington Federal account had a loan balance of $269,120.58. About a week later, on February 23, 2018, Thompson called Planet Home's customer service line.

During the recorded phone call, Thompson acted as though he had no recollection of the balance. He stated that "the numbers that you've sent me shows that I have a loan for $269,000. I—I borrowed $100,000 … I signed a Promissory Note … for $100,000." Thompson continued to insist that "I've never received an invoice" from Washington Federal and that "I have no idea where the 269 number comes from" because "this doesn't match with anything that I have." Indeed, Thompson claimed that he was "shocked" and "very perplexed" to see an invoice that was "significantly higher, and much more than … remotely … what we were talking about." He later clarified: "I know — I mean, I borrowed the money,

I owe the money — but I borrowed $100 thou — $110 — I think it was $110,000 dollars … I want to quickly resolve all this, and — and — you know, what I owe." To cap it off, he read out the amount on the invoice—"$269,120.58"—and said "I dispute that."

### C. Statements to the FDIC on March 1, 2018

A week later, on March 1, 2018, Thompson spoke on the phone with two FDIC contractors. Unlike the call with Planet Home, this one was not recorded, but the contractors testified about the conversation at trial.

At the time of the call, the FDIC contractors did not know how many loans Thompson had taken out. But they told Thompson that, according to the FDIC's records, he owed around $269,000. The contractors testified at trial that Thompson disputed this and explained that he borrowed $110,000 for "home improvement." These statements were likewise reflected in the notes the contractors took during the call.

Soon after, the contractors found out about Thompson's 2013 and 2014 loans. Once they discovered the other loans and called Thompson back on March 5, 2018, he again expressed doubt over the accuracy of the higher loan balance.

### D. Settlement

Eventually, Thompson and the FDIC agreed to settle his debt. During negotiations, Thompson insisted that he did not owe interest on the three loans, and the FDIC thought that it might struggle to collect the interest because Washington Federal had not kept proper records of the transactions. So the two parties settled for $219,000—the amount Thompson owed without interest in December 2018.

## II.  PROCEDURAL HISTORY

A grand jury charged Thompson in April 2021 with two counts of violating 18 U.S.C. § 1014—a statute that criminalizes making a "false statement … for the purpose of influencing in any way the action" of the FDIC or a mortgage lending business.

Count One alleged that, on February 23, 2018, Thompson falsely stated to Planet Home that he "only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect." Count Two alleged that, on March 1, 2018, Thompson made the same false statement to the FDIC, and that he also falsely stated that he took out the first loan to fund home improvements.

After a six-day trial, a jury convicted Thompson of both counts.[1] Unlike Count One, Count Two was accompanied by a special verdict, in which the jury found that Thompson falsely stated (1) that he "only owed $110,000" and that "any higher amount was incorrect" and (2) that "the funds he received from Washington Federal were for home improvement."

Thompson moved for acquittal, largely on the same grounds he now raises on appeal. The district court denied his motion.

The district court then sentenced Thompson to a below-guidelines term of four months in prison, followed by a year

---

[1] The jury also found Thompson guilty of several tax crimes. We do not discuss those offenses because Thompson raises no argument about them on appeal. *See O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (arguments not pursued on appeal are waived).

of supervised release. In doing so, the court ordered him to pay the unpaid loan interest—$50,120.58—to the FDIC.

### III.    ANALYSIS

Thompson challenges both the denial of his motion for acquittal and the restitution order. He makes four arguments: (1) his statements were not "false statements" under 18 U.S.C. § 1014; (2) the jury lacked sufficient evidence to convict him; (3) the government constructively amended the indictment; and (4) the district court lacked the authority to order restitution. Like the district court, we conclude that the first three arguments are unpersuasive. We also conclude that the court properly awarded restitution to the FDIC.

### A.  False Statements Under 18 U.S.C. § 1014

Thompson first argues that, because his statements were literally true, they were not "false statement[s]" within the meaning of 18 U.S.C. § 1014. To violate § 1014, a defendant must (1) make a false statement or report, (2) for the purpose of influencing in any way the action of a financial institution, (3) with respect to a loan, application, or another subject listed in the statute. *United States v. Wells*, 519 U.S. 482, 490 (1997). We formally review the denial of a motion for a judgment of acquittal de novo, although in practice our review is for sufficiency of the evidence. *United States v. Fitzpatrick*, 32 F.4th 644, 648–49 (7th Cir. 2022). Questions of statutory interpretation such as this one, however, are reviewed under a true de novo standard. *United States v. Thayer*, 40 F.4th 797, 801 (7th Cir. 2022).

As Thompson sees it, he never outright lied. For example, rather than stating that he *owed only* $110,000, he just said that he *borrowed* $110,000—which is true even if he later borrowed

more. Although Thompson acknowledges that his statements may have misrepresented what he owed, he contends that the statute does not reach statements that are misleading but literally true.

For support, Thompson relies on several cases involving 18 U.S.C. § 1014, but none stand for the proposition that a statement must be literally false to violate the statute. For instance, he invokes *Williams v. United States*, in which the Supreme Court held that writing a bad check does not amount to making a false statement. 458 U.S. 279, 284 (1982). In particular, Thompson points to our description of *Williams* in *United States v. Krilich*, where we remarked that "a misleading implication differs from a false statement." 159 F.3d 1020, 1029 (7th Cir. 1998). But our point—and the Supreme Court's point in *Williams*—was that "a check is not a factual assertion at all" and it thus "cannot be characterized as 'true' or 'false.'" *Williams*, 458 U.S. at 284. Thompson also invokes *United States v. Staniforth*, in which we reversed a conviction under § 1014 after concluding that a statement was "literally true." 971 F.2d 1355, 1361–62 (7th Cir. 1992), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997). Yet, in the same breath, we held that the statement also could not be understood in a misleading way and that "there is no evidence that the literal meaning is different from the parties' meaning." *Id.*

In the end, we need not decide whether Thompson's statements were literally true because his argument runs headfirst into our precedent. We already decided—in *United States v. Freed*—that § 1014 criminalizes misleading representations. 921 F.3d 716 (7th Cir. 2019).

The defendant there presented a slide to a bank while seeking to obtain a loan. The slide described a line of collateral

but, as it turned out, that collateral could not secure the loan in question because it had already been used to back up two other loans. *Id.* at 720. Similarly to Thompson, the defendant argued that a jury could not convict him under § 1014 because his statements were "technically true"—they accurately listed the details of the collateral, even if the slide misleadingly implied that the collateral was available. *Id.* at 723.

Rejecting this defense, we explained that the statements were false within the meaning of the statute because they "would not naturally be understood as simply stating facts about unavailable collateral," which was information that "would have been useless to the banks." *Id.* Instead, the presentation "clearly indicated" that the collateral could secure the loan—"a representation that … was false." *Id.* We further noted that other appellate courts "have held that the failure to disclose material information needed to avoid deception … constitutes a 'false statement or report,' and thus violates the statute." *Id.* (quoting *Williams v. United States*, 458 U.S. 279, 296 (1982) (Marshall, J., dissenting)).

The defendant in *Freed* also promised to abide by a loan agreement when he had no intent to keep that promise. We ruled that this, too, was a false statement under § 1014. *Id.* at 723–25. Congress, we explained, passed the statute to protect federally insured institutions from "false statements *or misrepresentations that mislead*." *Id.* at 723 (emphasis added) (quoting *Williams*, 458 U.S. at 294 (Marshall, J., dissenting)).

Against this doctrinal backdrop, Thompson's argument cannot survive because his statements were misleading. In the face of being told that he owed upwards of $260,000, he expressed shock, disputed that figure, and insisted that he had borrowed $110,000. All after he had admitted on loan

applications and to his accountant that he owed much more. Even if he never used the precise words, the implication of his statements was that he owed Washington Federal no more than $110,000—something that was untrue. As the district court concluded, these representations were therefore "false statements" according to this court's understanding of § 1014.

Thompson responds that the discussed portion of *Freed* is dictum because, in his view, the statements presented on the slide in that case were literally false. This argument ignores the contrary assumption *Freed* made. In *Freed*, we accepted for purposes of argument the defendant's claim that his statements were true in a technical sense. Then we explained that, even if the statements were literally true, the defendant still violated § 1014 because the statute applies to misleading statements as well as literally false ones. This conclusion was—entirely—our holding on two of the defendant's convictions. So it cannot be dictum, which is language that "can be sloughed off without damaging the analytical structure of the opinion." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988). If we were to strike this language from *Freed*, the opinion's analytical structure would not just be damaged, it would vanish.

Thompson alternatively argues that *Freed* is unpersuasive. For one thing, he says, *Freed* relied on commentary in a Supreme Court Justice's dissenting opinion. For another, the Supreme Court has ruled that the federal perjury statute—which also makes no mention of misrepresentations—does not reach misleading implications. *Bronston v. United States*, 409 U.S. 352, 361–62 (1973). What is more, Thompson continues, Congress has separately criminalized misleading statements and false statements in other fraud statutes. *See, e.g.*, 18 U.S.C.

§§ 1001(a), 1027, 1035, 1341, 1343, 1344, 1347, 1348. And largely for this reason, the Sixth Circuit has concluded that Congress did not intend to reach misleading statements in 18 U.S.C. § 1014. *United States v. Kurlemann*, 736 F.3d 439, 444–48 (6th Cir. 2013).

Because *Freed* is not merely persuasive authority, but binding precedent that has not been overruled, we must follow it. *See United States v. Ramirez*, 52 F.4th 705, 712 (7th Cir. 2022) (describing circumstances when overruling circuit precedent might be justified); *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582, 584 (7th Cir. 2005) (explaining that, even if the court considers one of its prior cases to be incorrect, this alone is not a sufficient reason to overrule the case). *Stare decisis*—"the idea that today's [c]ourt should stand by yesterday's decisions"—is foundational to the rule of law, promotes the "predictable" development of legal principles, and "contributes to the actual and perceived integrity of the judicial process." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455 (2015) (citation omitted). In this circuit, following our earlier decision in *Freed*, literal truth is not a defense to a § 1014 charge.

In sum, under our precedent, Thompson made false statements within the meaning of 18 U.S.C. § 1014.

**B. Sufficiency of the Evidence**

Thompson next argues that, for two reasons, the jury lacked sufficient evidence to convict him. Again, we functionally review the denial of a motion for a judgment of acquittal under a sufficiency of the evidence standard. *Fitzpatrick*, 32 F.4th at 648–49. The reason is that, when reviewing a challenge like this one, we must consider the evidence in the light most favorable to the government and draw all reasonable

inferences in its favor. *Id.* Under this "highly deferential standard," we may overturn a conviction only when "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Armbruster*, 48 F.4th 527, 535 (7th Cir. 2022) (citation and quotation marks omitted).

### 1. *Statements About Loan Amount*

First, Thompson contends that the jury lacked sufficient evidence to convict him of making false statements about his loan amount. Recall that the indictment charged Thompson with falsely telling the FDIC and Planet Home that he "only owed $100,000 or $110,000" and that "any higher amount was incorrect." In Thompson's view, we should overturn the verdict because he never said he owed "only" that amount, and the evidence established merely that he said he "borrowed"—not "owed"—$110,000.

Our earlier conclusion—that *Freed* applies—goes a long way to resolving this argument. After *Freed*, all the government had to prove was that Thompson represented, through either false or misleading statements, that he did not owe more than $110,000. In context, that was the import of his statements both to Planet Home and to the FDIC. When Thompson was told that he owed upwards of $260,000, he said that he'd never seen that number, disputed it, and acted shocked. Then Thompson stated that he borrowed $110,000. These statements gave the unmistakable impression that Thompson believed he owed only $110,000. Indeed, the jury found in the special verdict that Thompson falsely stated that he "only owed $110,000" and that "any higher amount was incorrect."

We therefore agree with the district court that the jury had sufficient evidence to find Thompson guilty of misrepresenting the loan amount, especially when the evidence is viewed in the government's favor.

### 2. *Statement About Home Improvement*

Second, Thompson argues that the jury lacked sufficient evidence to convict him of falsely telling the FDIC that he took out the first, $110,000 loan for purposes of "home improvement" because, in his view, he did not make this statement to influence the FDIC.

To prove a violation of 18 U.S.C. § 1014, the government must demonstrate that the defendant made the charged false statement "for the purpose of influencing in any way" the actions of one of the institutions listed in the statute, including the FDIC and any mortgage lending business. *United States v. Phillips*, 731 F.3d 649, 650 (7th Cir. 2013) (en banc). In *United States v. Wells*, the Supreme Court held that materiality is not required under § 1014—that is, the misrepresentation in the charged false statement need not be material to a financial institution's decision. 519 U.S. 482, 490 (1997) (citation and quotation marks omitted). Still, "[a] statement made for the purpose of influencing a bank will not usually be about something a banker would regard as trivial." *Id.* at 499 (citation and quotation marks omitted). For that reason, "it will be relatively rare that the Government will be able to prove that a false statement was … made with the subjective intent of influencing a decision unless it could first prove that the statement has the natural tendency to influence the decision." *Id.* (citation and quotation marks omitted). As we explained in *Phillips*, even though materiality is not an element of the

offense, "it is relevant" evidence of whether the defendant tried to influence a financial institution. 731 F.3d at 655.

Here, Thompson does not challenge the jury's determination that he falsely stated his loan was for "home improvement." Rather, he argues that the misrepresentation had no tendency to influence the FDIC because the FDIC did not care why he took out the loan; it just wanted the money back.

While making this argument, Thompson relies on our en banc decision in *Phillips*. In that case, a couple had made false statements on a mortgage application. 731 F.3d at 650–51. When the couple wanted to introduce evidence showing that a mortgage broker had told them that they'd filled out the form in the correct way, the district court rebuffed their attempt. It reasoned that false statements in a mortgage application necessarily show an intent to influence a bank's decision whether to grant the mortgage. *Id.* at 651, 653. We reversed, concluding that the evidence might have established that the mortgage broker convinced the defendants that the false information did not matter to the bank, negating the idea that they were trying to influence it. *Id.* at 656. In Thompson's view, the government commits the same error as the district court in *Phillips*: it assumes that Thompson must have intended to influence the FDIC purely because he lied to it.

The government replies that Thompson made the "home improvement" false statement because he knew it would match up with the little paperwork available on his loans from Washington Federal. Recall that the only document Thompson signed to obtain any of the loans was a promissory note for the first loan. And his house appeared to secure that note. So, the government theorizes, Thompson believed that if he told a story consistent with what appeared on the note,

the FDIC would not ask additional questions and discover the two other loans.

Though we are skeptical of the government's theory, our decision must be guided by the "highly deferential" standard of review at play. *Armbruster*, 48 F.4th at 535. The court may overturn a conviction only when the record is "devoid" of evidence supporting guilt beyond a reasonable doubt. *Id.* (citation and quotation marks omitted). And in making that determination, we must look at the evidence in the light "most favorable" to the government and draw "all reasonable inferences" in its favor. *Fitzpatrick*, 32 F.4th at 648–49 (citation and quotation marks omitted).

Given the standard of review, the jury had sufficient evidence to convict Thompson of the "home improvement" statement in the second count. As we have already concluded, the jury had enough evidence to convict Thompson of lying about *how much* he owed in order to influence the FDIC. Off the back of that determination, the jury could also have concluded that Thompson lied about *why* he borrowed that amount to further confuse the FDIC.

To be sure, Thompson is right that the FDIC would not have stopped trying to collect his loan just because he obtained it to improve his property. But the government did not need to prove that the home improvement lie was likely to cause the FDIC to give up completely. Instead, the government had to prove only that Thompson tried to influence the FDIC's actions "in any way." 18 U.S.C. § 1014. And one way Thompson influenced the FDIC's actions is by obstructing its collection efforts with smoke and mirrors. Put another way, the "home improvement" lie could have been understood as the latest tactic in Thompson's scheme to litter the

investigation with inaccurate information and conceal the true extent of his debts. The jury thus could have reasonably determined that Thompson tried to influence the FDIC by derailing, or at least delaying, the active investigation into his loans.

Our conclusion is consistent with *Phillips*. The defendants there explained to us why their lie might not have been intended to influence the bank. Thompson, by contrast, gives us no reason to think that his falsehood is more innocent than it looks. In fact, it is difficult to see why he would lie about the purpose of his loan if not to frustrate the FDIC's efforts. While we cannot, and do not, hold that Thompson intended to influence the FDIC just because he lied, the jury had ample reason to believe that Thompson provided the false statement to influence the FDIC by impeding its investigation. The context of his actions—misrepresenting why he took out a loan while the FDIC was attempting to figure out what he owed, after he had already concealed what he owed—supplies the evidence necessary to arrive at that conclusion.

We therefore agree with the district court that the record is not devoid of evidence from which a jury could have concluded that Thompson told the "home improvement" false statement to influence the FDIC.

### C. Indictment

Thompson also argues that the trial evidence constructively amended the indictment with respect to the statements he made about the loan amount. We review this question of law de novo. *United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002).

Under the Fifth Amendment, prosecutors can try a defendant only on the charges they allege in the indictment. *United States v. Heon Seok Lee*, 937 F.3d 797, 805–06 (7th Cir. 2019). Two doctrines emerge out of this rule: constructive amendment and variance. A constructive amendment happens when the trial evidence supports a conviction for a different crime than the one charged. *Id.* at 806. A variance, by contrast, occurs when the evidence supports a conviction for the same crime but does so by proving materially different facts from those alleged in the indictment. *United States v. Ajayi*, 808 F.3d 1113, 1125 (7th Cir. 2015). Each carries a different consequence. If an indictment is constructively amended, we must vacate the conviction. *Heon Seok Lee*, 937 F.3d at 806. If a variance occurred, we may vacate the conviction only if the defendant was prejudiced—either because he could not anticipate from the indictment which evidence would be presented against him at trial or because the variance put him at risk of being prosecuted twice for the same offense. *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007).

According to Thompson, the indictment alleged that he made one false statement (he "owed" only $110,000) while the evidence proved that he made another (he "borrowed" $110,000 and disputed a higher balance). The distinction matters, he insists, because a person would not naturally include the amount he owes in interest when stating how much he has borrowed. Thompson contends that, despite this, the government suggested to the jury that it could convict him of falsely stating that he borrowed $110,000 because he must have known the amount was higher after interest.

We pause at the outset to set the record straight. The jurors did not convict Thompson simply because he failed to

account for interest when stating how much he borrowed. Even taking interest out of the equation, Thompson borrowed much more than the $110,000 that he admitted to knowing about. He borrowed nearly double that amount—$219,000— meaning that he misrepresented the extent of his principal loan balance by over $100,000. This significant discrepancy, not semantics, led the jury to convict Thompson.

More to the point, while "borrowed" and "owed" can have different meanings, the difference here did not result in a constructive amendment. This issue also harkens back to *Freed*. Remember that a jury may find that a statement was false under 18 U.S.C § 1014 if the statement was merely misleading. *Freed* therefore eviscerates the distinction Thompson is trying to make between what the indictment charged (literally false statements) and what the evidence showed (misleading statements). Put another way, the trial evidence proved the same offense as the one charged in the indictment: a violation of 18 U.S.C. § 1014. *See United States v. Jara-Favela*, 686 F.3d 289, 300 (5th Cir. 2012) (concluding that no constructive amendment occurred, even though the indictment charged the defendant with using a different term than the one the government proved he used, because in context the two terms meant the same thing). What's more, the court gave the jurors a copy of the indictment and instructed them to convict only if the government proved the charged crimes—a procedure that "mitigate[s]" concerns about a constructive amendment. *Heon Seok Lee*, 937 F.3d at 808 n.5.

We may not vacate Thompson's conviction because of any variance, either. Thompson has not contended on appeal that the trial evidence proved materially different facts to those alleged in the indictment. Nor has he argued that any late

switch prejudiced him by impacting his trial preparation or exposing him to a risk of double jeopardy. Thus, to the extent that he wishes to pursue a variance theory, the argument is waived. *See United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023) (explaining that undeveloped arguments are waived).

In any event, no prejudice jumps out from the record. The indictment alleged enough detail about the misconduct to allow Thompson to avoid future prosecution based on the same conduct. *Heon Seok Lee*, 937 F.3d at 807. Indeed, the indictment detailed the amount and date of each loan Thompson took out from Washington Federal; that he had falsely stated to a mortgage lending business on "February 23, 2018," that he "only owed $100,000 or $110,000 to Washington Federal"; and that he had falsely stated to the FDIC on "March 1, 2018," that he "only owed $110,000" and that his loans "were for home improvement." These specifics provided Thompson with enough information to prepare for trial and sufficiently protected him from the risk of double jeopardy.

In sum, we agree with the district court that Thompson has not demonstrated that his conviction should be vacated because of either a constructive amendment or a variance.

### D. Restitution

Thompson last challenges the district court's award of approximately $50,000 in restitution to the FDIC. That figure is the amount of interest that accrued on his loans, and it was not accounted for in the $219,000 civil settlement that he reached with the FDIC before trial. Because Thompson is challenging the district court's authority to order the award, not its calculation of the amount, we review de novo. *United States v. Dickey*, 52 F.4th 680, 687 (7th Cir. 2022).

A district court must order restitution when an identifiable victim of a crime has suffered a financial loss. 18 U.S.C. § 3663A(a)(1), (c)(1)(B). A "victim" is a person who has been "directly and proximately harmed" by the offense. *Id.* at § 3663A(a)(2). As a result, restitution awards are limited to "actual losses caused by the specific conduct underlying the offense." *United States v. Eaden*, 37 F.4th 1307, 1313 (7th Cir. 2022) (citation omitted). Practically speaking, this means that the government must prove by a preponderance of the evidence both the loss amount and causation. *United States v. Meza*, 983 F.3d 908, 918 (7th Cir. 2020).

Thompson argues that the charged false statements did not cause the FDIC to settle for $219,000—the principal loan amount. What caused the FDIC to do that, in Thompson's estimation, was that it did not think that it could force him to pay the interest given that Washington Federal did not document his debts properly. The way Thompson sees it, because the FDIC knew about the interest when it chose to settle, his false statements did not induce the loss of that interest.

We disagree, and zooming out illustrates why. The FDIC suffered a total loss of about $269,000 because Thompson refused to pay and misrepresented what he owed. His actions forced the FDIC into a position in which it had to settle to avoid litigation. As a result of that settlement, Thompson paid the FDIC *some* of what he owed. While the FDIC settled for a reduced amount in part because of practical difficulties—Thompson's insistence that he owed no interest and the bank's lack of paperwork—those difficulties merely made it harder for the FDIC to recoup everything it lost. The practical difficulties are not the reason that the FDIC suffered the loss in interest in the first place. The overarching but-for cause of

the FDIC's loss, which includes the $50,000 in interest, is Thompson's initial false statement.

To the extent that Thompson understands the FDIC's decision to settle as a superseding cause, we disagree. The settlement here was not unforeseeable, nor was it something that could fairly absolve Thompson of responsibility. The reason any settlement needed to happen was because Thompson refused to pay everything that he owed. And the reason the parties settled for $50,000 less than the total loss was in part because of another misrepresentation Thompson told—that he owed only the principal amount and not the additional $50,000 in interest. So the agreement was not some outside, unpredictable force pulling responsibility away from Thompson. The reduced settlement was a natural consequence of his actions.

The government therefore proved by a preponderance of the evidence that the conduct underlying Thompson's offense caused the FDIC to lose $50,120.58, and the district court did not err by ordering restitution in that amount.

## IV.  CONCLUSION

For these reasons, we AFFIRM the district court's judgment.